**UNITED STATES of America,**

v.

**Joshua KESTENBAUM, Defendant.**

**No. 04–cr–821.**

United States District Court, E.D. New York.

Dec. 14, 2012.

---

Scott B. Klugman, Seth L. Levine, United States Attorneys Office, Brooklyn, NY, Plaintiff.

Alan Lewis, Buchanan Ingersoll & Rooney P.C., New York, NY, for Defendant.

## *OPINION AND ORDER*

NINA GERSHON, District Judge:

This opinion and order sets forth my findings of fact and conclusions of law following a hearing on charges that the defendant, Joshua Kestenbaum, violated the conditions of his probation. The United States Probation Department for the Eastern District of New York charged in a probation violation report ("Violation Report") that Mr. Kestenbaum violated mandatory conditions of his probation by: (1) providing false statements to the government and the Probation Department re-

garding his business enterprises and income in violation of 18 U.S.C. § 1001 ("Charge 1"); (2) committing tax evasion in violation of 26 U.S.C. § 7201 ("Charge 2"); and (3) failing to make all of his required monthly $2,500 restitution payments between April 2011 and February 2012 ("Charge 3").

On July 9, 10, and 11, 2012, a hearing was held on Charges (1) and (3) contained in the Violation Report.[1] Based upon the facts established at the hearing and after full consideration of the defendant's arguments, for the reasons stated below I conclude that the defendant knowingly, intentionally, and willfully made false statements to the government and the Probation Department, and knowingly, intentionally, and willfully failed to make all of his required monthly restitution payments of $2,500 from April 2011 through February 2012 despite his ability to do so.

## BACKGROUND

### A. Sentence

On September 28, 2004, pursuant to a cooperation agreement, Joshua Kestenbaum pled guilty to one count of conspiracy to commit bank and wire fraud in violation of 18 U.S.C. §§ 1349, 1343, and 1344. He was sentenced on June 12, 2008, and an amended judgment was entered on July 23, 2008. His offense level under the Sentencing Guidelines was thirty-one, which, given his criminal history category of I, resulted in a Guidelines sentencing range of 108 to 135 months. The government's motion for a downward departure based on substantial assistance was granted, and the defendant was sentenced to a five year term of probation. Mr. Kestenbaum was

---

1. During a pre-hearing conference on July 3, 2012, at the government's request, I agreed to hold Charge 2 in abeyance.

also ordered to pay the agreed-upon sum of $11,159,447 in restitution. The schedule for payment to the victim of his crime was set at $2,500 per month. I imposed no fine in light of the priority of his restitution obligations. A final forfeiture order in the agreed-upon amount of $2,500,000 was also entered.

The conditions of probation included that Mr. Kestenbaum: (1) not commit another federal, state, or local crime; (2) comply with his obligation to pay restitution in the amount of $2,500 per month; and (3) provide full financial disclosure to the United States Probation Department, to assure, among other things, that he paid restitution.

In setting the schedule of restitution payments at his sentencing hearing, I observed that Mr. Kestenbaum would not be in custody and would be able to work. Sentencing Tr. 26, June 12, 2008. Although I set the schedule at $2,500 per month, I noted that the amount would be subject to increase upon a more detailed review of his resources by the Probation Department. *Id.* I also observed the difficulty of setting the appropriate amount of scheduled payments under the restitution order: "He's living the same life-style, as far as I can see, that he lived before, when he engaged in massive fraud on other people. I need to know what efforts he's making to change his life-style so that other people who are victims of his fraud get the benefit ... he can't continue to live the same life-style and say he's making full amends." *Id.* at 9–10.

Counsel argued at the sentencing that Mr. Kestenbaum should be given a non-custodial sentence so that he could continue to run Bake Me A Wish ("BMAW"), his cake delivery service company, making it "profitable and enabl[ing him] in the future to make significant payments towards his forfeiture and restitution." *Id.* at 9. I

noted Mr. Kestenbaum's representation that he did not make a salary in his current role as president of BMAW and questioned the efforts he might make toward monthly restitution payments. *Id.* at 10–11. In response to counsel's assertion that Mr. Kestenbaum relied on the support of his and his wife's family, I noted, "[H]e doesn't have to draw a salary if his in-laws are supporting him. If his in-laws weren't supporting him, presumably he would draw a salary ... but the way this has been arranged I don't really have th[e] option [of setting the amount as a percentage of his salary, as is typical]." *Id.*

Defense counsel stated:

It is certainly foreseeable in the near future [BMAW] will be able to pay Mr. Kestenbaum a salary and we agree that when that occurs that the Court should require that he pay a percentage of that salary toward restitution. And in the meantime I would suggest the Court impose an order of a thousand dollars a month, but make it clear that number should increase when Mr. Kestenbaum begins to draw a salary.

*Id.* at 11. I noted, "The defendant has indicated contrition. The best way to continue to show that is to recognize that if he's not in custody, he needs to be earning money so that he can pay back what he owes to the victim here." *Id.* at 27.

## B. Charges of Violation of Probation

On February 28, 2012, the Probation Department issued the Violation Report. It seeks the revocation of probation and resentencing. *See* 18 U.S.C. § 3565 and Fed.R.Crim.P. 32.1. In response to a request for particularization of the false statement charge, the government, in a letter dated June 21, 2012, specified five categories of false statements that it intended to prove to establish Charge 1:

*False Statement Category # 1: MSR December 2010:* In the handwritten monthly supervision report [("MSR")] for December 2010 that the defendant provided to the U.S. Probation Office, the defendant falsely reported total monthly cash inflows of $3,000.00, including $0.00 in net earnings from employment.

\*     \*     \*     \*     \*     \*

*False Statement Category # 2: MSR January 2011:* In the handwritten monthly supervision report for January 2011 that the defendant provided to the U.S. Probation Office, the defendant falsely reported total monthly cash inflows of $2,916.41, consisting solely of $2,916.41 in net earnings from employment.

\*     \*     \*     \*     \*     \*

*False Statement Category # 3: DOJ Financial Statement:* In the U.S. Department of Justice Financial Statement dated July 28, 2008, the defendant falsely reported (1) that the only financial support from any source or person that he had received in the last six years was from his father, Joseph Kestenbaum; (2) that his monthly take home pay was $2,614.00; and (3) that his wife Vivian Kestenbaum's total monthly income was $2,400.00 and comprised solely her income from Waldman Publishing. The defendant also falsely reported (4) that there were no payments or obligations made on his behalf by others.

\*     \*     \*     \*     \*     \*

*False Statement Category # 4: Deposition Testimony Re False Debit Log; Production of False Debit Log:* In response to questions posed by an Assistant U.S. Attorney at a deposition on March 24, 2010, the defendant testified that he had documentation of all his meals claimed as BMAW business ex-

penses, which documentation set forth the dates and individuals with whom he conducted business at those meals.... That documentation—which the defendant provided to the government—contained materially false statements about the defendant's claimed business expenses, not only concerning meals, but also, for example, the defendant's profligate use of taxis. The log did not contain true and accurate entries; Kestenbaum made these false entries intentionally; and Kestenbaum knew when he produced the log that it contained materially false entries.

\*     \*     \*     \*     \*     \*

*False Statement Category # 5: Oral Statements to Probation Officer:* On December 23, 2011, the defendant told a U.S. Probation Officer that he has not been "dipping" into the BMAW business accounts since he was sentenced. He further specified that the only personal expenses that were paid by BMAW were his health insurance premiums and his therapist's fees.

Letter from Ilene Jaroslaw 2–5 (June 21, 2012), ECF No. 83.

## LEGAL STANDARDS

█ In a probation revocation proceeding, a district court must be "reasonably satisfied" that a probationer has failed to meet his conditions of probation in order to revoke his sentence. *United States v. Colasuonno*, 697 F.3d 164, 180–81 (2d Cir. 2012); *cf. United States v. Carlton*, 442 F.3d 802 (2d Cir.2006) (court must find by a preponderance of the evidence that the supervisee violated a condition of supervised release under 18 U.S.C. § 3583(e)(3)). For purposes of this case, I assume that the government must prove the violations by a preponderance of the evidence.

## A. Failure to Make Restitution

■ If a restitution payment schedule is imposed as a condition of probation, a probationer must make "all reasonable efforts to pay the fine or restitution. . . ." *Bearden v. Georgia*, 461 U.S. 660, 668, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983). "If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority." *Id.* at 672, 103 S.Ct. 2064; *see Colasuonno*, 697 F.3d at 180–81; 18 U.S.C. § 3614(b)(1) (allowing court to resentence defendant to imprisonment if "defendant willfully refused . . . or had failed to make sufficient bona fide efforts to pay" restitution).

■ If a probationer cannot meet his restitution obligations despite a bona fide effort to do so, his probation may not be automatically revoked. *Bearden*, 461 U.S. at 672, 103 S.Ct. 2064. "Where a fine or restitution is imposed as a condition of probation, and 'the probationer has made all reasonable efforts to pay . . . yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available.'" *Black v. Romano*, 471 U.S. 606, 614, 105 S.Ct. 2254, 85 L.Ed.2d 636 (1985) (quoting *Bearden*, 461 U.S. at 668–69, 103 S.Ct. 2064) (*Bearden* "recognized substantive limits on the automatic revocation of probation where an indigent defendant is unable to pay a fine or restitution" (*Bearden*, 461 U.S. at 666, 103 S.Ct. 2064)).

■ The test for revocation of probation under *Bearden* is not whether the probationer is indigent, but rather whether the

probationer "has made all reasonable efforts to pay. . . ." *Bearden*, 461 U.S. at 668–69, 103 S.Ct. 2064; *see also Green v. Abrams*, 984 F.2d 41, 46 (2d Cir.1993). A defendant's "own responsibility for his inability to pay" is relevant to the decision to revoke probation. *See United States v. Brown*, 744 F.2d 905, 911 (2d Cir.1984).

## B. False Statements

In order to prove a false statement under 18 U.S.C. § 1001, the government must prove that the defendant knowingly, intentionally, and willfully made a material statement or representation that he knew at the time to be untrue in a matter within the jurisdiction of a department or agency of the United States. *United States v. Wiener*, 96 F.3d 35, 37 (2d Cir.1996); *United States v. Milton*, 602 F.2d 231, 233 (9th Cir.1979).[2] An act is done intentionally and knowingly if it is done purposefully and voluntarily and not because of a mistake, accident, or other innocent reason. *United States v. West*, 666 F.2d 16, 20 n. 2 (2d Cir.1981). An act is done willfully if it is done with an intention to do something the law forbids, that is, with a bad purpose to disobey the law or with deliberate disregard for the law. *Id.* To be material, a statement must have "'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Gaudin*, 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)).

### THE HEARING

The charges were heard on July 9, 10, and 11, 2012. Two witnesses testified for the government: Probation Officer Carrie

2. There is no dispute in this case that the statements at issue were made in a matter within the jurisdiction of a department or agency of the United States.

Borona and Investigator Geoffrey Fig. Four witnesses testified for the defendant: BMAW's Vice President of Marketing and Operations Joseph Dornoff, Mr. Kestenbaum's nephew Avi Kestenbaum, BMAW's bookkeeper Bryce Morrison, and Mr. Kestenbaum's cousin Jerry Kestenbaum. Transcripts from the depositions of the defendant, his wife Vivian Kestenbaum, his accountant John Lieberman, Mr. Dornoff, and Mr. Morrison, all of which were taken in 2010, were admitted into evidence on the government's case, as was the transcript of the deposition of Hannah Kestenbaum, Mr. Kestenbaum's mother, taken April 27, 2012. In addition, the government submitted voluminous documents, including banking records, tax returns, accounting records, and financial statements. Mr. Kestenbaum also submitted documents in his defense.

I discuss below first whether Mr. Kestenbaum violated his probation by, as he admits, not making the required restitution payments between April 2011 and February 2012. Mr. Kestenbaum's primary defense is that he did not have sufficient resources to make his restitution payments, in part because BMAW did not pay him enough salary during this time. I then address whether he violated his probation by making false statements to the government and the Probation Department.

The findings made below are based on the credible evidence as determined by my review of the entire record.

## A. Failure to Pay Restitution

At the time of Mr. Kestenbaum's sentencing in June 2008, he was president of BMAW. Joseph Dornoff, then BMAW's marketing director,[3] and Brad Osop,

BMAW's part-time bookkeeper, were BMAW's only other employees. In October 2008, BMAW hired Bryce Morrison to replace Mr. Osop. Although the presence of several trusts, including one ostensibly for the benefit of his children, obscures the technical ownership of BMAW, the evidence was compelling that Mr. Kestenbaum had complete control over every facet of the company and was responsible for its every significant decision. He made all of the important financial decisions and set its employees' salaries, including his own and his wife's.

Although Mr. Kestenbaum took no salary from BMAW at the time of, and prior to, his sentencing, BMAW provided him with significant financial support, which covered many of his personal expenses. This financial support continued until at least March 24, 2010, the date of his deposition, long after he began to take a "salary" in July 2008, as discussed below. For example, Mr. Kestenbaum admitted that BMAW paid for all or nearly all of his meals. At his deposition he stated:

> ... I go out to dinner with these people who are my financial and emotional support who give me ideas of getting the business together.

Q: Are you going out for meals just about every day?

A: Yeah, I am. I do.

Q: All of your meals seem to be paid for?

A: And all of my meals are business. I don't go out with my wife ever. I really don't. I go out constantly with friends and people that help me all the time and you'll see it.

---

3. Mr. Dornoff was granted a small ownership interest in BMAW at some point after the government took his deposition on May 24,

2010, although the document granting him ownership was backdated to January 1, 2010.

Def.'s Dep. Tr. 67 (Mar. 24, 2010). BMAW relied on Mr. Kestenbaum to provide all of the information related to his purported business meals, and he told the bookkeeper how such meals should be recorded on BMAW's books.

Mr. Kestenbaum asserted that this was proper because all his meals were business meals, but two of his alleged dining companions deny that these business meals occurred. For example, BMAW's records purport to show that Mr. Kestenbaum had meals or drinks with his and BMAW's accountant, John Lieberman, on numerous occasions. However, Mr. Lieberman could not recall that Mr. Kestenbaum had ever treated him to meals, denied that they had drinks together, and could not remember ever being at several of the restaurants to which Mr. Kestenbaum claimed to have taken him. Similarly, Mr. Dornoff believed that BMAW's books overstated the number of business dinners he himself had attended with Mr. Kestenbaum. Furthermore, Mr. Kestenbaum's wife testified at her deposition that Mr. Kestenbaum normally ate his dinners at home. To the extent that Mr. Kestenbaum testified to the contrary, his testimony is not credited. Based upon the credible evidence, I find that a non-trivial number of meals that Mr. Kestenbaum claimed as business meals either did not take place or were not related to BMAW's business.

In addition, BMAW covered a substantial number of Mr. Kestenbaum's other personal expenses. BMAW paid for Mr. Kestenbaum's legal fees *in this criminal case* and for fees to a Nevada attorney to handle a felony conviction in Nevada for failing to repay gambling debts.[4] And Mr. Kestenbaum testified that BMAW paid for all his medical services, including his therapist, dentist, and gym fees. (His monthly gym fees, for which Mr. Kestenbaum claimed to have a prescription, were $125.)

Immediately after his sentencing in June 2008, BMAW began to pay Mr. Kestenbaum a "salary." In July 2008, he stated that he was earning a monthly salary of $8,125.13 per month (approximately $97,500 per year). These amounts are based on statements he disclosed in the 2008 Department of Justice Financial Statement ("2008 DOJ Financial Statement"), as discussed in further detail below. After subtracting his taxes and his monthly restitution payment, he reported that his "net take home pay" was $2,614 per month, or approximately $31,400 per year. While he did not disclose any "fringe benefits" or "other" money or income from any source, as described above, until at least March 2010, BMAW paid for many of Mr. Kestenbaum's personal expenses.

Although Mr. Kestenbaum earned a monthly "salary" between July 2008 and March 2011, he never received a regular paycheck. Instead, he received his "salary" via numerous cash withdrawals or

---

4. The defense argument that Mr. Kestenbaum's personal legal expenses were a proper business expense of BMAW is rejected. At his deposition, Mr. Dornoff stated that the legal fees were "Josh's personal expenses" and, as such, should be seen as an employee benefit. At trial, Mr. Dornoff unconvincingly changed his view, stating that the question of BMAW's payment of Mr. Kestenbaum's legal expenses "was discussed at great length in the company. And ultimately, for a number of reasons, Josh's essential to this company. I need him in order for it to survive. Therefore, it's in the company's best interest to ensure that Josh has proper representation. Furthermore, our major investor, George Rohr, has approved the use of company funds for legal reimbursement." Hearing Tr. 216–17 (July 10, 2012), ECF No. 115. As noted above, only after his deposition did Mr. Dornoff become an owner of BMAW, and hence, as he admitted, his fortunes are now intertwined with Mr. Kestenbaum's.

transfers to checking accounts that he controlled. After the fact, he directed BMAW's bookkeeper to "charge" the withdrawals or transfers against his salary. The withdrawals and transfers were made apparently at Mr. Kestenbaum's whim; instead of occurring at any set time, Mr. Kestenbaum transferred irregular amounts in irregular intervals to his personal account. At his March 2010 deposition, Mr. Kestenbaum explained that one reason for this odd method of payment was that he could not keep money in his checking account:

A: The cash withdrawals are—I have to pay everyday expenses that I have to do including helping with food and everything else for my family and they go—they are charged against my salary. They're all—as far as I know every cash withdrawal is charged against my salary and they're usually in the neighborhood of 2–, $300 at a time taken out.

Q: Quite often.

A: Quite often yes, and they are—they do pay for the everyday living of my family to function.

Q: Why do you take it out like that in cash?

A: The reason I do that is because I can't keep money in my checking account, so I take it out in cash and I give my wife money.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: You take it from your—so that your creditors don't know about it?

A: Well, don't know about it or can't access it. . . .

Def.'s Dep. Tr. 68–69.

At his deposition, Mr. Morrison, BMAW's bookkeeper, described how he would compute Mr. Kestenbaum's salary every week:

A: . . . [A]ny withdraws he takes out of the business account, that's what we kind of tally up and figure out what his salary, you know, is supposed to be.

Q: Okay, withdraws. What if he took a withdraw to pay for business expenses?

A: I mean, he would note that and I would post—I post whatever he tells me to post.

Q: Okay.

A: If I don't know what it's for I ask him. I don't make the decisions myself.

Morrison Dep. Tr. 16 (June 4, 2010). Mr. Morrison testified at the hearing, for the first time, that Mr. Kestenbaum chose this method of payment "to relieve some of the burden of paying all the salaries at once;" he did not mention this reason during his deposition. Mr. Kestenbaum is the only employee at BMAW with this unusual arrangement; Mr. Dornoff and Mr. Morrison are both paid by check.

Mr. Kestenbaum further acknowledged his regular practice of evading creditors:

A: I can't keep anything in my checking account because anything in my checking account—it has been done before—they get to, not just the judgment from the Government, but I have Government judgments that I personally signed for at Cosmopolitan [Mr. Kestenbaum's defunct company]. I have judgments, so they can attach my account at any one time to take that money, so I can't keep anything in a checking account because I'm afraid that it will be taken. That's why—what I do normally is when I take my restitution check I'll go down to the bank, I'll ask if there's any liens,

stick the $2,500 in my account and then immediately get a bank check to send to the Government.

Def.'s Dep. Tr. 13.

Mr. Kestenbaum also caused BMAW to make significant non-salary cash payments for his own or his family's benefit. For example, BMAW made substantial payments to his wife, Vivian Kestenbaum, which were accounted for on BMAW's books as her "salary." Ms. Kestenbaum reported to the IRS that she earned $16,539 from BMAW in 2008 and $13,846 in 2009. However, Mr. Kestenbaum testified at this March 2010 deposition that he was not aware of any work she had done for the company. Mr. Dornoff, BMAW's second in command, testified at his deposition that he did not know what services Vivian had provided but that Mr. Kestenbaum had set the amount of Vivian's salary.

Vivian Kestenbaum's deposition testimony on this point directly contradicted both Mr. Kestenbaum and Mr. Dornoff. She testified that Mr. Dornoff was aware of the services she had provided to BMAW and that "[h]e was the one that spoke to [her] about everything." About her work, she testified:

A: I did some research on the computer. I helped with some of the packaging, some development ideas. I did a lot of—I did research on the inside of the container. [Joe Dornoff] asked me to look for the—how to keep it cold. I looked up other websites that had cakes on them. I read articles whenever I picked up an idea or when I was watching TV.

Vivian Kestenbaum Dep. Tr. 8 (Aug. 31, 2010). She also testified that she initially discussed her position with Mr. Dornoff and that he determined how she would be paid. She later recanted this testimony, saying she had so testified because she was "a little nervous because [she] wasn't sure if [she] could say, you know, that [she] had spoken to Josh...." Id. at 27. She then stated that she had first talked to Mr. Kestenbaum about helping at BMAW, but reaffirmed that she had conversations with Mr. Dornoff about the work because he gave her "some leads and stuff like that." Id. Later, however, she testified that she could not recall whether she "checked in" with Mr. Dornoff more than once over the course of the two years BMAW employed her. Id. at 30.

At the hearing, Mr. Kestenbaum attempted to portray these payments as employment income. For example, Mr. Dornoff testified at the hearing that there was "[n]o question whatsoever" that Vivian Kestenbaum performed compensable work for BMAW. Hearing Tr. 208, ECF. No. 115. This argument is rejected as unsupported by credible evidence. Based upon the credible evidence, I find that Vivian Kestenbaum received money from BMAW which, though labeled salary, did not compensate her for services performed but was simply money that her husband provided to her.

BMAW made an additional $7,000 payment to Ms. Kestenbaum in April 2009. Mr. Kestenbaum asserted that, contrary to indications in BMAW's books, this payment was not salary but instead a loan made to Ms. Kestenbaum to pay the family's rent. He asserted an unusual reason for this arrangement: the money was provided as a loan to Ms. Kestenbaum because he knew she could pay it back, even if she had to turn to her mother for money. He believed this was a legitimate way to get cash in his family's hands because BMAW purportedly could not afford to pay him directly or make him a loan that he would not be able to repay. He explained his rationale:

Q: Why don't you just pay the rent [on your apartment]?

A: I can't afford to.

Q: But you're paying her to pay the rent.

Q: I'm paying her to pay the rent because as a loan I can't take it. I couldn't take it as a loan. I can't pay that. You know what, honestly, why would I have to hide paying the rent? I don't spend anything that I—

Q: It's a personal expense.

A: So it's—and am I not entitled to live? Am I not allowed to pay the rent for my house? I'm not going on vacations to Florida or anywhere else, you know, on junkets and everything. I'm living a normal life.

Q: But this is all income?

A: Understandable, and that's why there was no way for me right now to take 6,000 and pay taxes on it, pay $10,000 on—out of the business and have the business survive. There was just no way to do it.

Def.'s Dep. Tr. 153–54.

Mr. Kestenbaum also caused BMAW to make cash payments to himself that were *not* attributed to salary. Once Mr. Kestenbaum received an amount equal to his annual "salary," he would transfer additional money from BMAW's accounts, which would be entered on BMAW's books as a loan. For example, by December 2010, Mr. Kestenbaum had transferred to his personal account an amount that equaled his annual salary, and, according to BMAW's bookkeeper, Mr. Kestenbaum had no net earnings during that month. Nevertheless, that month Mr. Kestenbaum directed the bookkeeper to transfer sums totaling $9,500 to his personal account. This amount was booked as a loan to Mr. Kestenbaum, but it has never been fully repaid.[5] In addition, Mr. Kestenbaum admitted that he had received approximately $150,000 in still-outstanding loans from BMAW and that there would be no way for him to repay even a loan of a much smaller amount.

While the evidence established Mr. Kestenbaum's control of BMAW's accounts and resources, he has made known to this court and the government very little about the underlying details of BMAW's history or financial health. For example, although Mr. Kestenbaum started BMAW, served as its president, and continued to exert broad control over its business, he claimed not to remember significant information about the business itself. For example, he could not recall how much money BMAW had received in start-up funds, the identity of BMAW's officers, or whether it had a board of directors. In addition, he offered no documentary evidence of BMAW's true financial health such as cash flow reports, balance sheets, or statements from an independent auditor in support of his claim that BMAW could not pay him enough to allow him to pay his restitution.

Mr. Kestenbaum's resources were not limited to resources he took from BMAW in various forms. In addition to salary payments, non-salary payments, and personal expenses paid by BMAW, Mr. Kestenbaum's wife and mother-in-law contributed money to the household. For example, his wife Vivian Kestenbaum testified at her August 2010 deposition that, along with the income she received from her job with Waldman Publishing,[6] she

---

5. As discussed below, in this month Mr. Kestenbaum's MSR reflected that he had no gross or net earnings. The MSR also reflects that he had only $3,000 in "total monthly cash inflows."

6. Ms. Kestenbaum could not estimate her current salary from Waldman Publishing at her deposition. She acknowledged, however, that she reported to the IRS an income from

received approximately $4,000 per month from a family trust fund. And Mr. Kestenbaum's mother-in-law paid for his youngest daughter's college tuition.

Mr. Kestenbaum obtained a new and significant source of cash in March 2010, when his mother, Hannah Kestenbaum, opened a $200,000 home equity line of credit ("HELOC") secured by her home. Mr. Kestenbaum had control of this entire amount to use as he saw fit, and, between March and November 2010, he drew down the entire $200,000 loan amount.

From this HELOC money, on March 3, 2010, Mr. Kestenbaum deposited $25,000 into a linked checking account ("Linked Checking Account") for which he had blank checks, signed by Hannah Kestenbaum.[7] On March 11, 2010, he transferred approximately $59,000 to Vivian Kestenbaum pay off a loan that she had purportedly made to BMAW. Between March and November 2010, he used $37,250 to pay his rent and another $9,000 to pay his personal legal fees. Also during that time, he distributed an additional $57,000 to BMAW. (Mr. Morrison and Mr. Dornoff characterized this money as a loan despite the absence of any loan documentation.) The remainder of the $200,000 loan he spent on miscellaneous personal expenses, such as cash withdrawals, payments to his wife, medical expenses, and life insurance premiums. In addition to drawing on the HELOC directly, he drew $17,000 from the Linked Checking Account to pay rent.

By November 2010, Mr. Kestenbaum had drawn down the entire $200,000 loan.

I now turn my attention to the period directly relevant to the government's allegation that Mr. Kestenbaum failed to pay his restitution from April 2011 through February 2012. Mr. Dornoff testified that, by late 2010, BMAW's business was suffering. He stated that BMAW was broke to the point that it could no longer pay its bills by cash but instead relied on credit cards to remain afloat. It had recently lost a major client and faced rising advertising costs.[8] In February 2011, according to Mr. Dornoff, the company could not afford to pay his and Mr. Kestenbaum's salaries. He therefore took a ten percent pay cut and Mr. Kestenbaum "eliminated" his own salary beginning in March 2011. He also testified that Mr. Kestenbaum continued to receive a minimal salary through the remainder of 2011, and Mr. Kestenbaum "suspended" his medical reimbursements during 2011. In 2012, however, Mr. Kestenbaum's salary was reinstated to $96,000 per year, or $8,000 per month, and he was reimbursed for medical expenses he incurred between March and November 2011 in the amount of $7,400.

Despite BMAW's alleged financial struggles, BMAW began to repay its outstanding loan from Hannah Kestenbaum in December 2010. As noted above, this loan, like all other loans held by BMAW, was entirely undocumented. Furthermore, there is no evidence that the loan accrued interest, had a repayment timetable, or had a date certain by which it had to be

---

Waldman Publishing of $52,624 in 2008 and $41,030 in 2009.

7. The Linked Checking Account is a checking account that was associated, or "linked," to Hannah Kestenbaum's HELOC.

8. Mr. Kestenbaum did not off BMAW's business records, such as cash flow reports or

balance sheets, in support of his argument that its business was suffering. Standing alone, Mr. Dornoff's testimony is of limited probative value on the question of BMAW's true financial situation and, most importantly, on the question of the resources available to Mr. Kestenbaum.

paid off.[9] Nevertheless, between December 2010 and May 2012, BMAW returned $75,396—the entire sum that it purportedly owed Hannah Kestenbaum—to Hannah Kestenbaum's Linked Checking Account.

In light of the company's allegedly dire financial straits, there was no sound business reason why BMAW would choose to pay off an interest-free loan that had no repayment timetable and no due date. Mr. Morrison, BMAW's bookkeeper, did not know why the loan was being repaid at a time the company was so in need of money. It is noteworthy that the repayments began mere months before Mr. Kestenbaum "eliminated" his salary.

Although BMAW made deposits into the Linked Checking Account, none of the deposits actually went to pay down the balance of Hannah Kestenbaum's HELOC from her bank. As of May 2012, nearly all of the $200,000 principal balance on Hannah Kestenbaum's loan from the bank remained outstanding; BMAW's records indicated, though, that it no longer owed Hannah Kestenbaum any money. The money—$75,396—that BMAW deposited into the Linked Checking Account, however, was available for Mr. Kestenbaum to use at his discretion. Based upon the credible evidence and all of the circumstances, I conclude that Mr. Kestenbaum directed BMAW to repay the money from his mother so that he could then use those funds to pay for his personal expenses while claiming to draw no salary from the company.

As he transferred money from BMAW to the Linked Checking Account, he then used the Linked Checking Account to pay for his personal expenses as he had used BMAW's accounts in the past, including gifts to Vivian Kestenbaum, rental payments to his landlord, payment of his legal fees, and a payment to a social worker, who was his therapist. Between April 2011 and February 2012, the time during which the government alleges he did not pay his full restitution, Mr. Kestenbaum spent $64,740 from the Linked Checking Account on such expenses. During this time, he paid only $9,000 of the $27,500 that he owed in restitution, comprised of a payment of $7,500 in July 2011 and a payment of $1,500 in February 2012.[10] In addition, at least in December 2011, Mr. Kestenbaum's wife paid for a number of the household's expenses, including utilities, such as electricity, heating, oil and gas, water and sewer, telephone, and groceries.

Mr. Kestenbaum has admitted he did not make all of his required restitution payments between April 2011 and February 2012. He argues, however, that his failure to do so is only because he did not have the resources. I reject this contention and find that Mr. Kestenbaum had sufficient resources to make his restitution payments during this period. Mr. Kestenbaum had full access to the money in the Linked Checking Account, and he spent it on personal expenses as he had in the past. Indeed, since the payments from BMAW to the Linked Checking Account, to which Mr. Kestenbaum had access, were not treated as salary, they would not have been reduced by payroll

---

9. Avi Kestenbaum testified that, if the loan were not repaid by the time of Hannah Kestenbaum's death, it was to be deducted from Mr. Kestenbaum's inheritance; he did not substantiate this claim with documentation.

10. Appendix A contains a chart that illustrates the amount of restitution paid, the amount of money transferred from BMAW to the Linked Checking Account, and the amount of money transferred out of the Linked Checking Account for Mr. Kestenbaum's personal expenses between April 2011 and February 2012.

withholdings or other tax deductions; no BMAW records show otherwise.[11] Nearly every transfer from BMAW to the Linked Checking Account was made shortly before a payment from the Linked Checking Account of an identical or nearly identical amount for one of Mr. Kestenbaum's personal expenses. In other words, almost as soon as BMAW transferred money to the Linked Checking Account, Mr. Kestenbaum paid it out for his personal expenses.

Mr. Kestenbaum argues that the money derived from the HELOC was unavailable for restitution payments but was his mother's permissible financial support for his necessities, including rent, as well as gifts from his mother to his wife, Vivian Kestenbaum. This alleged "restriction" is rejected as a *post hoc* construct meant to mask Mr. Kestenbaum's resources. The money was available for Mr. Kestenbaum to use as he saw fit. Significantly, at his deposition, Mr. Kestenbaum himself described the money this way:

> A: My mother just recently took a $200,000 loan which was about a week ago, week-and-a-half ago, and she has signed some checks for me if I need to have access to some money *to help with anything I would need.* [Emphasis added.]

Def.'s Dep. Tr. 18. In addition, Hannah Kestenbaum never described any limits on this money; indeed, at her deposition she testified that she "[didn't] know what [Joshua and Vivian Kestenbaum] use [the HELOC money] for." Hannah Kestenbaum Dep. Tr. 10. (Apr. 27, 2012). She also supplied Mr. Kestenbaum with blank checks and exercised no oversight on how the money was spent.[12] Although Mr.

Kestenbaum relied on his cousin, Avi Kestenbaum, to establish that the money was unavailable for restitution, Avi Kestenbaum's testimony on this point was equivocal: while he stated that Mr. Kestenbaum was, only to use the money "to provide basic needs," including rent, he acknowledged that Mr. Kestenbaum's rent is not "cheap." (Since at least March 2010, Mr. Kestenbaum's rent has been at least $6,000.) He also acknowledged that some of the money was used to pay Mr. Kestenbaum's personal legal fees. Furthermore, the evidence clearly established that Mr. Kestenbaum used these funds for his other personal expenses. In sum, the credible evidence established that the money from Hannah Kestenbaum's HELOC was available to Mr. Kestenbaum without restriction and that he could have used it to pay restitution.

In January 2012, Mr. Kestenbaum reinstated to himself a salary of $96,000 per year ($8,100 per month). In addition, as noted above, around the same time he was reimbursed for medical expenses he incurred between March and November 2011 in the amount of $7,400.

At all times relevant here, the evidence demonstrated that Mr. Kestenbaum continues to enjoy a very comfortable lifestyle. At the time of his sentencing in 2008, his rent was $12,500 per month, which was paid for by his wife's family. The Kestenbaums moved to a two-bedroom apartment on the Upper West Side no later than March 2010, which rented for at least $6,000 per month. He paid the rent through the HELOC or Linked Checking Account between March 2010 and November 2010, and again in April

---

11. I make this observation solely as it relates to Mr. Kestenbaum's available resources, aware that Charge 2 is held in abeyance.

12. Although Avi Kestenbaum first testified that Hannah Kestenbaum ran "everything" by him with respect to financial decisions, he later testified that he was only "consulted" on general concepts.

2011, November 2011, December 2011, and January 2012. The family also employed a housekeeper who worked in the home for "a few hours" four days a week and earned a weekly salary of $420.[13] (The Kestenbaums continue to employ household help; Probation Officer Borona observed a housekeeper preparing dinner when she visited the Kestenbaum's apartment on June 8, 2012. She also stated that the Kestenbaum's building had a doorman. Officer Borona described the apartment as a "large apartment which is comprised of two bedrooms in the rear of the apartment, along with a bathroom, a formal dining room, a living room, kitchen, and laundry room.")

As noted at the outset, the thrust of Mr. Kestenbaum's defense is that he could not afford to pay his restitution because he was without the resources to do so, in part because BMAW did not pay him a salary. (He does not address why he failed to pay his full restitution in January 2012 when he began to take a salary again.) The fatal flaw in this argument is that Mr. Kestenbaum made the decision to eliminate his own salary and, even when he eliminated it, he continued to draw support from BMAW and his other resources. As

his counsel stated in summation, "I suppose he could have done this a little differently. That is, I suppose Josh could have said, you know what. Instead of cutting my salary all the way to zero, since we can afford to do this loan repayment of about 5,000 a month, I will cut my salary from you know eight or nine to five instead of paying—instead [of] getting this debt off of Bake Me A Wish's book." Hearing Tr. 442 (July 11, 2012), ECF No. 116. Counsel represented, while discussing the 2008 DOJ Financial Statement, his client's thought process: "He's focused. He remembers what you said. He's focused on what his own salary is. He thinking that's what is going to affect this, if it changes.[[14]] You also heard me say we agreed with you, Your Honor, that the Court should require that he pay a percentage of that salary toward restitution." *Id.* at 422.

Of course, manipulation of the labels attached to the money that flowed directly from BMAW into Mr. Kestenbaum's pocket, to try to shield that money from being used for restitution, contravenes the very rationale upon which I based my decision to order a noncustodial sentence for Mr. Kestenbaum. I granted Mr. Kestenbaum a non-custodial sentence in part based on

---

**13.** Mr. Kestenbaum suggested, via Avi Kestenbaum's testimony, that Vivian Kestenbaum's mother pays for the housekeeper:
Q: Do you know a maid or an employee who sometimes helps Vivian at the apartment?
A: As far as I know, just from conversations with Vivian, there is a woman who takes care of her mother, who is not well, and that woman may go over to their apartment, sometimes—I don't know whether it's once a week, and help out there. But that woman, as far as I understand, is the primary housekeeper for Vivian's mother.
Q: Who pays for that housekeeper?
A: I don't know. But it certainly—certainly? I don't know but I don't think it's Josh's money.
Q: Do you know from Vivian whose money it is?

A: I believe that it comes from Vivian's mother. In fact, I—Vivian has told me that it comes from her mother. So my belief is based on what Vivian told me, that the mother—the money comes from her mother.
Hearing Tr. 255, ECF. No. 115. This testimony is in stark contrast to Vivian Kestenbaum's testimony at her deposition. Vivian Kestenbaum stated flatly that she pays the housekeeper, and that, in addition to the housekeeper's work at her house, she "also helps out at [her] mother's house." Vivian Kestenbaum Dep. Tr. 35.

**14.** This representation is unsupported by actual evidence of Mr. Kestenbaum's intent.

his representation that he needed to be at liberty to work to earn money so he could pay restitution to the victim of his crime.

In sum, in light of the factual findings detailed above, I conclude that Mr. Kestenbaum's failure to meet his full restitution requirements between April 2011 and February 2012 was knowing and intentional. Mr. Kestenbaum had sufficient resources during that time to pay his restitution, including approximately $64,740 that he spent on personal expenses. Although his wife's assets would not need to be used to pay his restitution, *see United States v. Corbett,* 357 F.3d 194, 196 (2d Cir.2004), insofar as her resources contributed to their household expenses, he had more resources to pay for restitution. In choosing to use the resources available to him to sustain his and his family's lifestyle rather than repay the victim of his crime, he willfully failed to pay his restitution. *See Colasuonno,* 697 F.3d 164, 182.

### B. False Statements

Before I turn to the specific false statements alleged by the government, I observe that the preceding discussion clearly establishes that Mr. Kestenbaum engaged in numerous deceptive and manipulative practices. As I have concluded, he arranged to "eliminate" his salary to avoid paying restitution while continuing to finance all of his personal expenses. He admitted to evading his creditors through various schemes intended to prevent garnishment or other collection on outstanding judgments. He has directed his company to pay significant personal expenses and to make loans to him that he knew he could not repay.

#### 1. 2008 Department of Justice Financial Statement

In False Statement Category # 3, the government charged that:

In the U.S. Department of Justice Financial Statement dated July 28, 2008, the defendant falsely reported (1) that the only financial support from any source or person that he had received in the last six years was from his father, Joseph Kestenbaum; (2) that his monthly take home pay was $2,614; and (3) that his wife Vivian Kestenbaum's total monthly income was $2,400 and comprised solely her income from Waldman Publishing. The defendant also falsely reported (4) that there were no payments or obligations made on his behalf by others.

Mr. Kestenbaum signed the 2008 DOJ Financial Statement, which contained a certification that it was "a complete statement of all [his] income and assets, real and personal, whether held in [his] name or by any other." His signature also attested that he had both "knowledge of the penalties for false statement provided by" 18 U.S.C. § 1001 and "knowledge that this financial statement is submitted by [him] to affect action by the United States Department of Justice. . . . "

I find that Mr. Kestenbaum knowingly, intentionally, and willfully made false statements to the government in his 2008 DOJ Financial Statement. With respect to False Statement Category 3(1), Mr. Kestenbaum stated that his only other source of financial support in the previous six years was from his father. (This statement was in tension with his counsel's representation at the sentencing that he received generous support from his and his wife's family.) [15] Mr. Kestenbaum failed to state, as he later admitted at his deposition, that he had obtained over $105,000 from BMAW and over $12,000 in deposited

---

**15.** Elsewhere on the 2008 DOJ Financial Statement, Mr. Kestenbaum disclosed that his

rent was $12,500 per month, which was paid by "members of [his] wife's family."

checks from his mother between April 2007 and October 2007. Mr. Kestenbaum funneled these monies to a checking account titled in BMAW's name but used the money to pay for his personal expenses.

With respect to False Statement Category 3(2), Mr. Kestenbaum stated that he was earning a monthly salary of $8,125.13 (approximately $97,500 per year) and that his monthly taxes amounted to $3,010.72.[16] Subtracting these amounts, along with his monthly restitution payment ($2,500), he stated on the DOJ 2008 Financial Statement that his "net take-home pay" was $2,614.41 per month ($8,125.13 minus $3,010.72 minus $2,500), which is nearly $31,400 per year. He did not disclose any "fringe benefits" or "other" money or income from any source.

Mr. Kestenbaum failed to disclose approximately $3,238 in total salary payments for the month of July 2008. BMAW's records show $7,653.36 in checks made payable to Mr. Kestenbaum during this month along with an additional $700 in cash withdrawals, for a total of approximately $8,353. Therefore, Mr. Kestenbaum failed to report approximately $3,238 in July 2008 in payments directly from BMAW to him ($8,353 minus $2,614.41 in "net take-home pay" minus $2,500 in restitution).[17] This omission, which covered a single month, occurred only weeks after

his sentencing, when I had explicitly stated that his restitution schedule would be re-evaluated based on his further disclosures to the government.

With respect to False Statement Category 3(3), Mr. Kestenbaum stated that his wife's total monthly take-home pay was $2,400 from working at a publishing house. He failed to disclose a $3,035 payroll check to his wife from BMAW that he signed, dated July 15, 2008.

Regarding False Statement Category 3(4), Mr. Kestenbaum stated that there were no monthly payments or obligations made on his behalf by others. However, BMAW's records demonstrate that in July 2008 BMAW made $3,933 in payments for medical, legal, and religious services on behalf of Mr. Kestenbaum, which he failed to disclose. Furthermore, as noted above, BMAW provided Mr. Kestenbaum with nearly all of his meals.

### 2. Mr. Kestenbaum's March 2010 Deposition

In False Statement Category # 4, the government charged that:

In response to questions posed by an Assistant U.S. Attorney at a deposition on March 24, 2010, the defendant testified that he had documentation of all his meals claimed as BMAW business expenses, which documentation set forth the dates and individuals with

---

**16.** As explained above, Mr. Kestenbaum never received a regular paycheck, instead receiving his compensation via cash withdrawal, or transfers to checking accounts and, after the fact, directed BMAW's bookkeeper to "charge" the withdrawals or transfers against his salary.

**17.** In its analysis, the government appears to take issue with Mr. Kestenbaum's subtraction from his "net take-home pay" of the amounts that went toward his restitution payment. Mr. Kestenbaum's counsel notes that this amount was disclosed on the form and argued that it should not be included in a calculation

of amounts that he failed to disclose. He argues, without any supporting evidence, that any misstatement regarding "net take-home pay" was an innocent mistake because Mr. Kestenbaum completed the form around the same time he began to draw a salary, and he considered the question to exclude restitution payments because it asked only for Mr. Kestenbaum's "take-home pay." In any event, even treating the money Mr. Kestenbaum took from BMAW to pay his restitution as sufficiently disclosed, I nevertheless find that he failed to state the full amount of his net take-home pay.

whom he conducted business at those meals. That documentation—which the defendant provided to the government—contained materially false statements about the defendant's claimed business expenses, not only concerning meals, but also, for example, the defendant's profligate use of taxis. The log did not contain true and accurate entries; Kestenbaum made these false entries intentionally; and Kestenbaum knew when he produced the log that it contained materially false entries.

I find that Mr. Kestenbaum knowingly, intentionally, and willfully stated falsely that all of his meals are business meals in response to questions posed by an Assistant U.S. Attorney at his deposition on March 24, 2010, as charged in Category 4.[18] At his deposition, Mr. Kestenbaum stated:

A: ... Every single one [of Mr. Kestenbaum's business meals] is documented as far as why.

Q: Where is the documentation?

A: We have a list in the company of every single person I've gone out to dinner with and why.

Q: And the date?

A: No why necessarily, but the dates of when we've gone out to dinner, every single—

\* \* \* \* \* \*

Q: I was going to ask you if you had some kind of calendar.

A: Yeah, we have, and I go out to dinner with these people who are my financial and emotional support who give me ideas of getting the business together.

Q: Are you going out for meals just about every day?

A: Yeah, I am. I do.

Q: All of your meals seem to be paid for?

A: And all of my meals are business. I don't go out with my wife ever. I really don't. I go out constantly with friends and people that help me all the time and you'll see it.

Def.'s Dep. Tr. 67. As discussed above, these statements are false. *See supra*, pp. 370–71. The obvious purpose of such false statements was to show that the meals were not a benefit—a financial resource—to him but only a benefit to his company, and to disguise what emerged clearly at the hearing: that Mr. Kestenbaum has complete control of BMAW's business assets.

### 3. *Monthly Supervision Reports to the Probation Department*

Throughout this period, Mr. Kestenbaum was required to make monthly reports to the Probation Department regarding his finances. Specifically at issue here are two MSRs—from December 2010 and January 2011—that the government alleges contained false statements. Mr. Kestenbaum signed both MSRs, each of which contained the certification that "ALL INFORMATION FURNISHED IS COMPLETE AND CORRECT" and warned him that "ANY FALSE STATEMENTS MAY RESULT IN REVOCATION OF PROBATION, SUPERVISED RELEASE, OR PAROLE, IN ADDITION TO 5 YEARS IMPRISONMENT, A

18. The government clarified at the hearing on June 22, 2012, that the documentation provided evidence of the false statement but was not the false statement itself because the documents were not provided in response to a

government request. That is, the falsity is that the business meals claimed were business expenses, not the falsity of the business records.

$250,000 FINE, OR BOTH. (18 U.S.C. § 1001)."

### a. December 2010 Monthly Supervision Report to Probation

In False Statement Category # 1, the government charged that:

In the handwritten monthly supervision report for December 2010 that the defendant provided to the U.S. Probation Office, the defendant falsely reported total monthly cash inflows of $3,000, including $0 in net earnings from employment.

In his December 2010 MSR, Mr. Kestenbaum reported $3,000 in "total monthly cash inflows" and $0 in both "gross wages" and "net earnings." [19] He did not report any cash outflows. He also indicated that his mother had paid $6,250 in rent for the month and that a $2,500 payment to an alcohol and drug treatment center was paid for by a credit card.

In fact, BMAW made $9,925 in total payments to Mr. Kestenbaum in December 2010. [20] (During the month, $16,775 was electronically transferred from BMAW's bank account to Mr. Kestenbaum's personal bank account, while $7,100 was transferred from his personal bank account to BMAW's account. BMAW also paid $250 to Mr. Kestenbaum by check.) Mr. Kestenbaum failed to disclose $4,425 in "total monthly cash inflows" ($9,925 minus $2,500 in restitution minus $3,000 as stated "total monthly cash inflows") and $7,425 from his net earnings ($9,925 minus $2,500 in restitution). Mr. Kestenbaum also received additional support from BMAW that month that he did not report, including a $2,000 payment to the law firm defending him in this case. [21] Therefore, I find that Mr. Kestenbaum knowingly, intentionally, and willfully made false statements to the Probation Department in his December 2010 MSR.

### b. January 2011 Monthly Supervision Report to Probation

In False Statement Category # 2, the government charged that:

In the handwritten monthly supervision report for January 2011 that the defen-

---

**19.** The MSR itself does not define the term "total monthly cash inflows." To the extent that defense counsel argues that Mr. Kestenbaum did not understand the term to include his restitution, I reject the argument as to Mr. Kestenbaum's intent as unsupported by evidence. Moreover, Mr. Kestenbaum did not indicate his restitution payment *anywhere* on the MSR, despite that the form specifically asked whether he had "a special assessment, restitution, or fine." In any event, as my analysis demonstrates, even if I leave out the restitution amount from the amount Mr. Kestenbaum failed to disclose, the evidence shows that he failed to disclose a substantial amount of money.

**20.** Mr. Kestenbaum argues in post-hearing briefing that there is no evidentiary support that Mr. Kestenbaum earned a wage in December 2010 in light of Mr. Morrison's testimony that the money Mr. Kestenbaum received in that month was a loan. Def.'s Mem. 1 n.1, ECF No. 106. However, Mr. Morrison also testified that, as of July 11, 2012, the purported loan had not been paid back in its entirety. Furthermore, Mr. Kestenbaum stated in his deposition that he had no ability to pay back loans. Thus, the argument that this money was a loan to Mr. Kestenbaum is rejected.

**21.** In post-hearing briefing, and consistent with his summation, defense counsel argued that even if these amounts were not disclosed on the MSR, "[i]t was no secret to anybody by December, 2010/January, 2011 that BMAW reimbursed Mr. Kestenbaum for legal expenses and health care expenses. Mr. Kestenbaum and others testified to these facts at the 2010 depositions," Def.'s Mem. 10, ECF No. 106, and therefore Mr. Kestenbaum should not be penalized for not disclosing the payments on the form. I reject the claim that payments for Mr. Kestenbaum's personal legal expenses were appropriately omitted from this form. *See supra*, p. 371 n. 4.

dant provided to the U.S. Probation Office, the defendant falsely reported total monthly cash inflows of $2,916.41, consisting solely of $2,916.41 in net earnings from employment.

On his January 2011 MSR, Mr. Kestenbaum reported $2,916.41 in net earnings and no other cash inflows. He also reported that his mother had paid $6,200 in rent on his behalf and that a $2,500 check had been paid by BMAW on January 31, 2011, for his restitution.

BMAW made $6,990 in total payments on behalf of Mr. Kestenbaum during this month. Mr. Kestenbaum failed to disclose at least $1,500 ($6,990 minus $2,916.41 in disclosed earnings minus $2,500 in restitution) that he received from BMAW on his January 2011 MSR. And BMAW wrote an additional check to Mr. Kestenbaum in the amount of $6,250, which was purportedly a clerical error; Mr. Morrison reported that the check was supposed to have been made out to Hannah Kestenbaum to repay her loan to BMAW. Regardless of the intended recipient, as discussed above, Mr. Kestenbaum had full access to the money that BMAW paid to Hannah Kestenbaum. Therefore, I find that Mr. Kestenbaum knowingly, intentionally, and willfully made false statements to the Probation Department in his January 2011 MSR.

### 4. Interview Statement to the Probation Office

In False Statement Category # 5, the government charged that:

> On December 23, 2011, the defendant told a U.S. Probation Officer that he has not been "dipping" into the BMAW business accounts since he was sentenced. He further specified that the only personal expenses that were paid by BMAW were his health insurance premiums and his therapist's fees.

On December 23, 2011, Mr. Kestenbaum stated to a United States Probation Officer during an interview that he has not been "dipping" into the BMAW business accounts since he was sentenced. As the factual findings above demonstrate, since his sentencing, Mr. Kestenbaum has consistently used BMAW's funds for his personal expenses, including using BMAW to pay his personal medical and legal bills, causing "loans" from the company to himself that he knew he could not repay, and "eliminating" his salary while using BMAW's payments to the Linked Checking Account to pay for his personal expenses. In sum, his statement to the probation officer was knowingly, intentionally, and willfully false.

### 5. The False Statements Were Not a Mistake or Innocent Oversight

In summation, defense counsel argued that, even if some information was omitted from Mr. Kestenbaum's statements, the omissions were the product of mistake or other innocent oversight. To take but one example, when addressing Mr. Kestenbaum's failure to indicate in the 2008 DOJ Financial Statement that others made payments on his behalf, Mr. Kestenbaum's counsel said:

> What the government says is that question 82 on this form, which is on page 28 and it's got some very small writing down the left side, a lot of boxes, and one of them is: Payments on obligation made on your behalf by others. And he didn't fill out the box. You Honor, I suggest that what that is, is inattention to detail.... So, what you're seeing in the failure to disclose the support from others is inattention to detail. It's not an intentional misrepresentation.

Hearing Tr. 420–21 (July 1, 2012). There is no evidentiary support for counsel's contention that Mr. Kestenbaum did not intend to make false statements. On the

contrary, the evidence, including Mr. Kestenbaum's own admissions, overwhelmingly establish his manipulative, intentional, and willful effort to present himself as unable to pay restitution while assuring that all the comforts of his lifestyle were met. He knew the statements were false at the time he made them, and he made them deliberately.

### 6. "Advice of Bookkeeper" Defense

In summation, defense counsel also argued that Mr. Kestenbaum simply relied on information provided by Mr. Morrison or Mr. Dornoff in providing certain responses to the government, particularly regarding his "gross pay," "net pay," and whether restitution was included in his "take-home pay." I noted my skepticism of this line of defense at the summation, and I specifically reject it here. As I have found above, Mr. Kestenbaum directed BMAW to make monetary transfers to himself and instructed staff on how to label those payments. Here, where Mr. Kestenbaum controlled BMAW's accounts and provided the bookkeeper with instruction on how to categorize payments to himself and others, he cannot shield himself by claiming reliance on his bookkeeper's labels.

### 7. Materiality

■■ Mr. Kestenbaum argues in post-hearing briefing that, even if any of the statements he made were false, they were not material.[22] As noted earlier, to be material, a statement must have " 'a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed.' " *United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (quoting *Kungys v. United States,* 485 U.S.

759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)). "A false statement [under 18 U.S.C. § 1001] is material if it tends to or is capable of influencing the decision-making body to which it was addressed" or if it is "capable of distracting government investigators' attention." *United States v. Stewart,* 433 F.3d 273, 318 (2d Cir.2006). "The statement need not actually influence the agency, but it must have the capacity to do so." *United States v. Rogers,* 118 F.3d 466, 472 (6th Cir.1997).

■ To begin with, Mr. Kestenbaum's arguments mischaracterize the standard for materiality. Plainly, the false information provided to the government and the Probation Department was designed to affect their respective decisions as to whether to seek an increase in the defendant's restitution or issue a violation report for his failure to comply with the condition of his probation relating to restitution. Each of the false statements easily meets the standard of materiality under *Gaudin,* 515 U.S. at 509, 115 S.Ct. 2310, and *Stewart,* 433 F.3d at 318; *see also United States v. Adekanbi,* 675 F.3d 178, 183 (2d Cir.2012) ("[a]s a matter of common sense," providing false identity to government during a safety-valve proffer could allow "any reasonable juror" to conclude lie was material). The government need not have proved that the Probation Department actually relied on these statements in filing the Violation Report; it needed only to show that the statements tended to, or were capable of, influencing the Probation Department, and this it easily did. *Stewart,* 433 F.3d at 318. Because the false statements masked the true depth of Mr. Kestenbaum's resources, and thus went directly to the heart of my direction to the Probation Department to obtain a full ac-

---

22. After the hearing, Mr. Kestenbaum filed a memorandum and reply memorandum regarding the materiality of the false statements under 18 U.S.C. § 1001. The government filed a response on the same issue.

counting of his financial circumstances, the statements were capable of influencing the decision to file the Violation Report.

As I stated at his sentencing, Mr. Kestenbaum's restitution payment schedule was subject to being increased "based upon a review by the Probation Department ... because I do think that a more detailed analysis of the defendant's finances needs to be made so that a determination as to what he truly can afford will be available to the Probation Department and to the Court." Sentencing Tr. 26–27; *supra*, pp. 366–67. The Probation Department and the government (which is authorized by law to collect the restitution judgment under 18 U.S.C. § 3612(c)) questioned Mr. Kestenbaum for the purpose of collecting restitution; all his statements were in response to those questions.

Mr. Kestenbaum's arguments that none of the five categories of false statement "include so much as a single representation about Mr. Kestenbaum's wealth" or that "only one [of the statements made to the United States Attorney's Office] by Mr. Kestenbaum [is] about his own income" are meritless. Def.'s Mem. 5, ECF No. 106; Def.'s Reply Mem. 2, ECF No. 111. The questions related directly to his resources to pay restitution, whether those resources are labeled salary, wealth, income, gifts, or other payments.

Mr. Kestenbaum argues that any omissions of money BMAW paid directly for medical or legal expenses were not material to assessing the amount of restitution Mr. Kestenbaum could reasonably pay on a monthly basis because the money was not available to Mr. Kestenbaum to pay his restitution. I reject this argument. As I concluded above, BMAW paid for significant amounts of Mr. Kestenbaum's personal expenses, and this helped to make his other resources available for the payment of restitution. By obscuring these pay-

ments from the Probation Department's review, Mr. Kestenbaum understated his resources and his ability to make his restitution payments. *See Corbett,* 357 F.3d at 196. For the same reason, as discussed above, *supra,* pp. 370–71, 380–81, I also reject Mr. Kestenbaum's argument that his deposition testimony concerning BMAW's payment of all or nearly all of his meals was immaterial.

Mr. Kestenbaum also complains that the government "failed to offer any evidence that [the December 2010 and January 2011 MSRs] were in any way representative of the vastly larger body of financial information Mr. Kestenbaum reported to Probation over the course of his supervision" and that the government's "artificial selection of these two highly atypical months raises the question whether, if Mr. Kestenbaum had reported $8,000 plus of income for these two months, rather than the lower amounts, this would have had 'a natural tendency' to 'affect' a decision by the Probation Department to seek increased monthly restitution." Def.'s Mem. 9–10, ECF No. 106. To begin with, there is no requirement that the false statements be "typical" or "representative." In any event, the months were identified by the government in a letter dated June 21, 2012, as ordered by the court, in response to Mr. Kestenbaum's request for particularization of the statements related to Charge 1. ECF No. 83. The government's letter stated that the statements it detailed were not exhaustive of Mr. Kestenbaum's false statements, and the record does not support Mr. Kestenbaum's claim that these months were trivial. Even if these months were atypical, they were salient because they represent the time period immediately before Mr. Kestenbaum stopped paying his restitution.

Finally, Mr. Kestenbaum argues that the materiality of his statements must be

judged by their context, relying on *Weinstock v. United States*, 231 F.2d 699 (D.C.Cir.1956), for the proposition that "a statement that is material in isolation, when viewed in context, may not be." Def.'s Mem. 3, ECF No. 106. This principle, he claims, renders immaterial any false statements he may have made because he made earlier truthful disclosures of the same information to the government at various times and in various manners. He is incorrect. *See United States v. Foxworth*, 334 Fed.Appx. 363, 366 (2d Cir. 2009) ("That the FBI knew that the statements were false when they were made is irrelevant to their materiality."). And here, unlike in *Weinstock*, Mr. Kestenbaum's statements were not isolated, parenthetical observations. Rather, as I have found above, they were waves in a sea of misstatements meant to keep the government and the Probation Department from obtaining a clear picture of the resources available to him to pay his restitution.

### C. Mr. Kestenbaum's Request to Reconsider The Order Denying Dismissal of Charge 3

By letter dated July 17, 2012, Mr. Kestenbaum moved the court, among other things, to dismiss Charge 3 on the grounds that the government raised new arguments at the hearing that defense counsel could not have reasonably anticipated. I denied the motion in an order filed July 30, 2012, stating:

> Prior to the hearing, and at the defendant's request, the government provided Mr. Kestenbaum with a detailed bill of particulars of the specific statements constituting Charge 1 in its letter dated June 21, 2012. Mr. Kestenbaum did not seek additional particulars for Charge 3—perhaps because so much informa-

tion on that charge had been provided in the government's June 11, 2012 letter. July 30, 2012 Order, ECF No. 101.

In a motion filed August 7, 2012, Mr. Kestenbaum moved for reconsideration of the July 30 order, arguing that the order made two factual errors: it erred in stating that 1) Mr. Kestenbaum failed to seek "particulars for Charge 3," and 2) the government provided "far more information [about Charge 3] than a defendant typically receives." Def.'s Mem. 1, ECF No. 107. He also argued that "the holding of the tax charge 'in abeyance' ... did not render unimportant or unnecessary Mr. Kestenbaum's calling of a tax expert.... Mr. Kestenbaum was prejudiced by the scheduling of a hearing that did not allow him to offer the testimony of a tax expert." *Id.* at 3.

The July 30 order did overlook a brief one-paragraph section within a fourteen-page motion headlined, "THE GOVERNMENT SHOULD BE REQUIRED TO PARTICULARIZE CHARGE THREE" in counsel's letter dated April 13, 2012. ECF No. 66. Therefore, Mr. Kestenbaum's motion for reconsideration is granted.

The request to particularize Charge 3 was not pressed in any subsequent hearing or document after counsel's April 13 letter. Nor was the mistake in the July 30 order material to my conclusions that Mr. Kestenbaum was not entitled to a full description of the evidentiary detail upon which the government would rely, and counsel had access to the majority of the government's evidence far in advance of the hearing. In addition, the issue at the hearing did not depend on technical definitions of the word "income" or "earnings," as Mr. Kestenbaum suggests, but rather on the resources available to Mr. Kestenbaum to make restitution payments and the veracity of statements that he made to the government and the Probation Department.

The absence of a tax expert at the hearing did not prejudice Mr. Kestenbaum. Therefore, upon reconsideration, Mr. Kestenbaum's motion to dismiss Charge 3 is again denied.

## CONCLUSION

For the reasons stated above, I find that the government has proved by a preponderance of the evidence—indeed, by overwhelming evidence—that Mr. Kestenbaum is guilty of violating the conditions of his probation by making false statements in violation of 18 U.S.C. § 1001 and by failing to pay his restitution. Mr. Kestenbaum's motion to the court to reconsider its July 30, 2012 order regarding Charge 3 is GRANTED, but on reconsideration, Mr. Kestenbaum's request that the court dismiss Charge 3 is DENIED.

Mr. Kestenbaum's resentencing is set for February 27, 2013 at 2:30 p.m. The defendant is directed to file any legal or factual submissions relating to the sentencing by February 6, 2013, and the government and the Probation Department are directed to respond by February 20, 2013.

**SO ORDERED.**

### Appendix A

| Month | Restitution Paid | Transfers from BMAW to Linked Checking | Transfers from Linked Checking For Kestenbaum's Personal Expenses |
|---|---|---|---|
| April 2011 | $0 | $ 9,900 | $ 9,000 |
| May 2011 | $0 | $ 6,154 | $16,250 |
| June 2011 | $0 | $ 3,500 | $ 4,090 |
| July 2011 | $7,500 | $ 5,904 | $ 5,000 |
| August 2011 | $0 | $ 3,904 | $ 3,000 |
| September 2011 | $0 | $ 5,000 | $ 3,000 |
| October 2011 | $0 | $ 5,904 | $ 6,500 |
| November 2011 | $0 | $ 7,500 | $ 7,400 |
| December 2011 | $0 | $ 9,500 | $ 9,500 |
| January 2012 | $0 | $0 | $0 |
| February 2012 | $1,500 [23] | $ 1,000 | $ 1,000 |
| Total | $9,000 | $58,266 | $64,740 |

23. Probation Officer Barona stated that it was possible that payments recorded by the probation office at the beginning of any given month might in fact be payments that were made the previous month. For example, the payment record on February 2, 2012, could be in fact the restitution payment for January 2012. The defendant raises no serious issue about this; in any event, there is no dispute that restitution payments were missed, regardless of their precise attribution to a particular month and that Mr. Kestenbaum paid $9,000 of his required $27,500 restitution between April 2011 and February 2012.